OPINION
{¶ 1} The defendant-appellant, Joseph D. Murphy, appeals the July 30, 2004 judgment of the Marion County Common Pleas Court determining that he is not mentally retarded pursuant to the standard outlined by the Supreme Court of Ohio in State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011,2002-Ohio-6625.
 Procedural History {¶ 2} In September 1987, Murphy was sentenced to death following his convictions for aggravated murder, aggravated robbery, aggravated burglary, and extortion. His conviction was affirmed by this court, seeState v. Murphy (June 26, 1991), 3rd Dist. No. 9-87-35, unreported, as well as the Supreme Court of Ohio, see State v. Murphy (1992),65 Ohio St.3d 554, 605 N.E.2d 884, cert. denied Murphy v. Ohio (1993),510 U.S. 834, 114 S.Ct. 109. Murphy filed a petition for post-conviction relief, which the trial court denied, and we affirmed. See State v.Murphy (May 12, 1995), 3rd Dist. No. 9-94-52, unreported, appeal not allowed, 74 Ohio St.3d 1405, 655 N.E.2d 184. Additionally, Murphy sought habeas corpus relief in the federal court system, but that case is being held in abeyance pending the litigation before this Court.
 {¶ 3} In 2002, the United States Supreme Court decided Atkins v.Virginia (2002), 536 U.S. 304, 122 S.Ct. 2242, which held that the execution of mentally retarded criminals violates the Eighth Amendment's prohibition against cruel and unusual punishment. In Atkins, however, the Court left the determination of whether a criminal defendant is mentally retarded to the states. Id. at 317. Consequently, the Supreme Court of Ohio adopted a three-prong test in order to determine whether a criminal defendant is mentally retarded in order to avoid execution. Lott,97 Ohio St.3d at 305.
 {¶ 4} On August 21, 2002, Murphy filed a post-conviction petition in the Marion County Court of Common Pleas arguing that he is mentally retarded pursuant to the standard outlined in Lott and, therefore, cannot be put to death because of the United States Supreme Court's decision inAtkins. In March, 2004, the trial court held an evidentiary hearing on Murphy's claim, and on June 30, 2004, the trial court determined that Murphy was not mentally retarded and, subsequently, denied Murphy's petition for post-conviction relief. It is from this judgment that Murphy appeals alleging one assignment of error.
 The Evidentiary Hearing {¶ 5} At the evidentiary hearing to determine whether Murphy was mentally retarded, both sides presented one expert witness. Murphy offered the testimony of Dr. Caroline Everington, a special educator, who researches and teaches in the area of mental retardation. Conversely, the State presented Dr. James Sunbury, a clinical psychologist, who specializes in several different criminal psychological evaluations, including determining whether defendants are competent to stand trial.
 {¶ 6} In her testimony, Dr. Everington noted that in order to be classified as mentally retarded according to the definition established by the American Association of Mental Retardation (AAMR), one must have (1) significant subaverage intellectual functioning; (2) significant deficits in adaptive skills; and (3) the condition had to be manifested before the age of 18. Accordingly, while testifying Dr. Everington reviewed all six IQ tests administered to Murphy when he was 18 years old and younger, as well as Murphy's adaptive skills and whether his mental condition was manifested before he reached the age of 18.
 {¶ 7} The first test administered to Murphy was in 1975 when he was 9 years old. Murphy scored an 86, but Dr. Everington cautioned that the version of the test administered to Murphy was out of date at the time he took it. Dr. Everington testified that Murphy was given the Wechsler Intelligence Scale for Children (WISC), which was replaced in 1974 by the Wechsler Intelligence Scale for Children-Revised (WISC-R). Consequently, Dr. Everington concluded that this score was not a reliable indication of Murphy's IQ because of the Flynn effect — a phenomenon that increases people's IQ test score over time as a test becomes out dated and more standardized. In this case, Dr. Everington noted that the WISC was approximately 28 years old; therefore, in her opinion, the Flynn effect inflated Murphy's score.
 {¶ 8} Second, Dr. Everington discussed the IQ test that was administered to Murphy in 1978 when he was 13 years old. On this test, Murphy scored a 76. Dr. Everington testified that Murphy was given the proper IQ test during the evaluation, i.e. WISC-R.
 {¶ 9} Third, Dr. Everington testified to the next IQ test, which Murphy took in 1979 when he was 14 years old. Murphy scored a 54 on this examination, and Dr. Everington noted that the original test administrator stated in his report that Murphy's low score was not a proper evaluation of his ability.
 {¶ 10} Fourth, Dr. Everington reviewed the IQ test results of the examination administered to Murphy in 1980 when he was 15 years old. Dr. Everington again testified that Murphy was given an out dated test, i.e. the original WISC. Thus, Dr. Everington stated that Murphy's high score, an 83, is not a reliable indication of his true ability because of the Flynn effect.
 {¶ 11} Fifth, Dr. Everington discussed the results of the IQ test administered to Murphy in 1981 when he was 16 years old. On this test, Murphy scored a 76, and Dr. Everington testified that the proper test was administered.
 {¶ 12} Finally, Dr. Everington examined the results of the IQ test given to Murphy in 1983 when Murphy recently turned 18. Dr. Everington testified that the proper exam was administered in this case, and Murphy scored an 82. Dr. Everington testified that she was "troubled" by this score because it did not seem to align with Murphy's previous IQ scores. Moreover, Dr. Everington attempted to retrieve the original protocols for this examination in order to determine if the test was scored correctly; however, she was unable to locate the necessary information.
 {¶ 13} In her conclusion as to whether Murphy meets the first prong of the AAMR standard for mental retardation, Dr. Everington found that Murphy's scores of 54 and 82 were likely outliers, i.e. numbers not statistically linked to the rest of the scores. Dr. Everington testified that, in her opinion, Murphy is functioning at a 75, which is right on the border of mental retardation. Dr. Everington noted that the inconsistency among Murphy's IQ scores made it difficult to determine whether Murphy was within the mentally retarded range. The record states:
Q: Now, we've gone through all of the reports of the IQ tests that wereadministered to Mr. Murphy both before he turned 18 and some after heturned 18. What do those reports, in their totality, tell you about Mr.Murphy's intellectual functioning?
 A: Those reports in their totality — again this is a difficult casebecause it is not — it is not a clean cut IQ scores, and clearly in thecut off for mental retardation. You have some that are in that range andsome that are not. So it's — it's really difficult to say with absolutecertainty that his intellectual functioning has consistently been in themental retardation range because of the variation of the scores.
Evidentiary Hearing Tr. at 74.
 {¶ 14} Next, Dr. Everington testified to Murphy's deficient adaptive skills. Initially, Dr. Everington noted that Murphy's evaluations testing did not include much adaptive skills testing; therefore, there was limited information on which to base her assessment. Consequently, in order to attempt to get an accurate opinion of Murphy's adaptive skills, she had to talk with the individuals that were involved in Murphy's life prior to him going to prison for murder.[1]
 {¶ 15} In her attempt to retrospectively evaluate Murphy's adaptive skills, Dr. Everington talked with Murphy's brother, grandmother, and his social worker, as well as administered another test. Dr. Everington testified that Murphy's relationship with his social worker yielded the best indication of his adaptive skills. In her conclusion, Dr. Everington stated all of the people interviewed indicated that Murphy was "slower than the other kids." Moreover, Dr. Everington testified that, in her opinion, Murphy's test score, coupled with the interviews of close friends and family, indicated that Murphy meets the second prong of the AAMR criteria for mental retardation.
 {¶ 16} Finally, Dr. Everington testified that Murphy's problems began when he was a young child and continually worsened as he grew older. In her conclusion, Dr. Everington stated that even though Murphy's wide range of IQ scores made it difficult to confidently place Murphy within the mental retardation range, reviewing his adaptive skills score coupled with his IQ scores indicated that Murphy's condition manifested prior to the age of 18.
 {¶ 17} On cross-examination, the State highlighted three points for the judge to consider when making his determination of whether Murphy is mentally retarded. First, the State pointed out that every time Dr. Everington testified in a criminal case as to the issue of mental retardation, she has found the defendant to be mentally retarded. Second, the State noted that while Dr. Everington does do educational research in the field of mental retardation, she is not a licensed psychologist and cannot administer IQ tests or make an initial determination based on those tests whether someone is mentally retarded. Finally, the State highlighted that throughout all of Murphy's IQ testing, beginning with his IQ test in 1975 and continuing until today, no psychologist or psychiatrist has ever concluded that Murphy was mentally retarded.
 {¶ 18} Conversely, the expert witness for the State, Dr. Sunbury, reviewed the examination he administered to Murphy prior to Murphy's murder trial in 1987. Dr. Sunbury stated that, in his opinion, Murphy did have subaverage intelligence but his intelligence was not sosignificantly subaverage to be diagnosed as mentally retarded. In an IQ test administered to Murphy to assist in Dr. Sunbury's determination of whether Murphy was competent to stand trial, Dr. Sunbury opined that Murphy's score, a 66, was not an accurate reflection of Murphy's true intellect. Furthermore, Dr. Sunbury testified that he believed Murphy's true IQ is between 70-80. Admittedly, Dr. Sunbury testified that he did not perform any adaptive skills testing on Murphy, but he testified that an adaptive skills analysis was not necessary unless Murphy's IQ was below 70. Moreover, Dr. Sunbury testified that while Murphy did not have an extended or complex vocabulary, he was able to converse with Dr. Sunbury in an interview and during testing without problems.
 {¶ 19} Based on this testimony, the trial court made the following findings of fact in concluding that Murphy was not mentally retarded:
1. The Defendant does not possess significantly sub-averageintellectual functioning which is a necessary requirement to beclassified as being mentally retarded.
 2. Even though the Defendant-Petitioner has been evaluated by eightdifferent psychologists, not a single one has diagnosed him as beingmentally retarded.
 3. Defendant-Petitioner's IQ has consistently been found to be inexcess of 70, which provides a presumption that he is not mentallyretarded.
 4. After reviewing the tape recordings of the interviews with theDefendant-Petitioner, this Court cannot conclude that theDefendant-Petitioner lacked adaptive skills such as communication, andself-direction. In fact, this Court was impressed withDefendant-Petitioners ability to communicate and logically carry on aconversation with police officers.
 5. Any difficulties that the Defendant-Petitioner possesses did have anonset before age 18.
Judgment Entry at p. 3-4.
 Assignment of Error THE TRIAL COURT COMMITTED CLEAR ERROR WHEN IT DENIED APPELLANT MURPHYRELIEF ON HIS CLAIM THAT HE IS MENTALLY RETARDED UNDER ATKINS V.VIRGINIA, 536 U.S. 304 (2002). APPELLANT'S DEATH SENTENCE VIOLATES THECONSTITUTION BECAUSE HE IS IN FACT MENTALLY RETARDED.
 {¶ 20} The Ohio Supreme Court expressly held that a defendant on death row may litigate an Atkins claim to determine whether the defendant is mentally retarded in a petition for post-conviction relief pursuant to R.C. 2953.23(A)(1) ((b) if the petition is filed within 180 days of theLott decision.[2] Lott, 97 Ohio St.3d at 307. R.C. 2953.23(A)(1)(b) states that a court may not entertain a second petition or successive petitions for post-conviction relief unless "the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petitioner asserts a claim based on that right." R.C. 2953.23(A)(1)(b). Accordingly, the Ohio Supreme Court opined that raising an Atkins claim is within the application and purpose of R.C. 2953.23(A)(1)(b). Lott,97 Ohio St.3d at 306. We note that Murphy's claim was filed within 180 days of the Lott decision, and, therefore, is within the guidelines outlined in Lott and R.C. 2953.23(A)(1)(b).
 {¶ 21} In Lott, the Ohio Supreme Court adopted the three prong test created by the AAMR to determine whether a defendant was mentally retarded and barred from execution pursuant to Atkins. Id. at 305. TheLott court stated that the burden is on the defendant to prove by a preponderance of the evidence that he or she has (1) significant subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills; and (3) onset before the age of 18 in order to be diagnosed as mentally retarded. Id. at 305 and 307. While IQ tests are one of many factors to determine the defendant's mental capability, they are not alone sufficient to make a final determination. Id. Nevertheless, the Supreme Court of Ohio held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Id.
 {¶ 22} In considering an Atkins claim, the trial court must conduct its own de novo review of the evidence, which should include professional evaluations and expert testimony, to determine whether the defendant is mentally retarded. Id. at 306. Once the trial court makes its determination of the defendant's mental status, its decision will not be disturbed absent an abuse of discretion. See State v. Stalling, 9th Dist. No. 21969, 2004-Ohio-4571, at ¶ 5 ("We begin by noting that a trial court has discretion to grant or deny a petition for post-conviction relief. As such, this court will not reverse a trial court's decision absent an abuse of discretion.") (internal citations omitted). An abuse of discretion requires more than an error in judgment; it implies unreasonable, arbitrary, or unconscionable conduct by the court. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 23} After reviewing the extensive psychological testimony provided by Dr. Everington and Dr. Sunbury, we conclude that the trial court did not abuse its discretion in determining that Murphy was not mentally retarded. First, Murphy was interviewed by at least eight psychologists since he was a child and no one has ever diagnosed him to be mentally retarded. Second, an extensive review of the record shows that Murphy's IQ scores were consistently above 70. Moreover, even his lowest scores, a 54 in 1979 and a 66 in 1987, were discredited by both expert witnesses. Third, Dr. Everington, the defense expert witness, testified that Murphy was functioning at an approximate IQ of 75, which is within the mental retardation range but above the score of 70 that the Ohio Supreme Court indicated creates a rebuttable presumption that the defendant is not mentally retarded. Fourth, and perhaps most importantly to the issue of subaverage intellectual functioning, Dr. Everington further testified that "it's really difficult to say with absolute certainty that his intellectual functioning has consistently been in the mental retardation range because of the variation of the scores."
 {¶ 24} In conclusion, therefore, even if this Court were to determine that the second and third prongs of the Lott were met, we cannot conclude that the trial court's determination that Murphy did not possesssignificantly subaverage intelligence was unreasonable, arbitrary, or unconscionable. Thus, the assignment of error is overruled, and the determination of the trial court is affirmed.
Judgment Affirmed.
 Rogers and Bryant, JJ., concur.
[1] Dr. Everington stated that it is commonly accepted that one may lose adaptive skills while being in prison or on death row.
[2] Petitions filed later than the 180 days are subject to the standards for untimely and successive petitions for post-conviction relief. Lott, 97 Ohio St.3d at 307.