OPINION
{¶ 1} Defendant-appellant, Mark E. Burke, appeals from a judgment of the Franklin County Court of Common Pleas denying his petition for post-conviction relief pursuant to Atkins v.Virginia (2002), 536 U.S. 304. Because defendant is entitled to two attorneys when raising an Atkins claim for the first time, we reverse.
 {¶ 2} In 1990, defendant was convicted of aggravated murder and aggravated robbery. The jury recommended to the trial court that defendant be given the death penalty. The trial court accepted the jury's recommendation and sentenced defendant to death. Defendant appealed. In State v. Burke (Dec. 28, 1993), Franklin App. No. 90AP1-344, this court affirmed defendant's conviction and sentence. On appeal, the Ohio Supreme Court affirmed. State v. Burke (1995), 73 Ohio St.3d 399. Defendant's petition for writ of certiorari was denied on March 25, 1996.Burke v. Ohio (1996), 517 U.S. 1112. On September 19, 1996, defendant filed a petition for post-conviction relief. The trial court denied defendant's petition in a decision rendered February 17, 1998. This court affirmed in State v. Burke (Feb. 17, 2000), Franklin App. No. 99AP-174; the Ohio Supreme Court did not allow the appeal. State v. Burke (2000), 89 Ohio St.3d 1452. On May 22, 2001, defendant filed an application to reopen his direct appeal pursuant to App.R. 26(B), and this court denied defendant's application in State v. Burke (Nov. 15, 2001), Franklin App. No. 90AP-1344. On appeal, the Ohio Supreme Court affirmed. State v. Burke, 97 Ohio St.3d 55, 2002-Ohio-5310.
 {¶ 3} In 2002, the United States Supreme Court rendered its decision in Atkins, supra, holding that execution of a mentally retarded individual is unconstitutional. Based upon Atkins,
defendant filed his second petition for post-conviction relief. Pursuant to the standards set forth in State v. Lott,97 Ohio St.3d 303, 2002-Ohio-6625, the trial court found defendant is not mentally retarded and denied the petition. Defendant appeals, assigning the following seven errors:
ASSIGNMENT OF ERROR NO. 1:
THE TRIAL COURT'S REFUSAL TO CONSIDER RELEVANT EVIDENCE, INCLUDING BUT NOT LIMITED TO THE FLYNN EFFECT OR THE STANDARD ERROR OF MEASUREMENT, DENIED [DEFENDANT] HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, THE EFFECTIVE ASSISTANCE OF COUNSEL, AND THE RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.
ASSIGNMENT OF ERROR NO. 2:
THE TRIAL COURT'S REFUSAL TO GIVE EFFECT TO THE EXPERT'S FINDING THAT [DEFENDANT] HAD SIGNIFICANT ADAPTIVE LIMITATIONS DENIED [DEFENDANT] HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, THE EFFECTIVE ASSISTANCE OF COUNSEL, AND THE RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.
ASSIGNMENT OF ERROR NO. 3:
[DEFENDANT] MET HIS BURDEN OF PROVING MENTAL RETARDATION BY A PREPONDERANCE OF THE EVIDENCE AND THE TRIAL COURT'S FINDING TO THE CONTRARY WAS AGAINST THE WEIGHT OF THE EVIDENCE. EXECUTING A PERSON WHO IS MORE LIKELY THAN NOT MENTALLY RETARDED VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT AND THEEIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.
ASSIGNMENT OF ERROR NO. 4:
THE OHIO COURT'S IDENTIFICATION OF A SINGLE, ARBITRARY IQ SCORE OF 70 TO CREATE A REBUTTABLE PRESUMPTION THAT A DEFENDANT IS NOT MENTALLY RETARDED IF HIS IQ SCORE IS ABOVE THAT NUMBER VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT, AS WELL AS THE RIGHT TO DUE PROCESS, THE RIGHT TO EQUAL PROTECTION, AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS. THE PRESUMPTION HERE OPERATED TO DENY [DEFENDANT] HIS CONSTITUTIONAL RIGHTS.
ASSIGNMENT OF ERROR NO. 5:
[DEFENDANT] WAS ENTITLED TO HAVE HIS CULPABILITY WITH RESPECT TO THE DEATH PENALTY DECIDED BY A JURY WHICH REFLECTS THE CONSENSUS IDENTIFIED BY THE SUPREME COURT IN ATKINS V.VIRGINIA. THE REFUSAL OF THE TRIAL COURT TO ORDER A NEW SENTENCING HEARING DENIED [DEFENDANT'S] RIGHTS TO DUE PROCESS, EQUAL PROTECTION OF THE LAW, EFFECTIVE ASSISTANCE OF COUNSEL, AND THE RIGHT TO BE FREE FROM THE IMPOSITION OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR NO. 6:
THE PROCEDURE SET FORTH IN STATE V. LOTT AND FOLLOWED BY THE TRIAL COURT FAILS TO PROVIDE CONSTITUTIONALLY ADEQUATE PROCEDURES FOR THE DETERMINATION OF [DEFENDANT'S] MENTAL RETARDATION. BOTH THE EQUAL PROTECTION CLAUSE AND THE SIXTH AMENDMENT REQUIRE A JURY DETERMINATION OF MENTAL RETARDATION.
ASSIGNMENT OF ERROR NO. 7:
THE TRIAL COURT ERRED IN FAILING TO APPOINT TWO ATTORNEYS IN THIS CAPITAL POST-CONVICTION PROCEEDING. THE REFUSAL TO APPOINT TWO ATTORNEYS RESULTED IN THE DENIAL OF [DEFENDANT'S] CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION, EFFECTIVE ASSISTANCE OF COUNSEL, AND FREEDOM FROM ARBITRARY, CRUEL AND UNUSUAL PUNISHMENT.
 {¶ 4} The state also asserts a single cross-assignment of error:
THE TRIAL COURT ERRED IN STRIKING SECONDARY MATERIALS AS "HEARSAY," AS THOSE MATERIALS WERE RELEVANT UNDER THE "LEGISLATIVE FACTS" DOCTRINE TO THE LEGAL AND POLICY QUESTIONS OF WHAT STANDARDS WILL GOVERN THE ESTABLISHMENT OF MENTAL RETARDATION FOR PURPOSES OF THE EIGHTH AMENDMENT.
 {¶ 5} In Atkins, the United States Supreme Court held that executing mentally retarded criminal defendants is "excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." Id. at 321. Explaining, the court stated that "[m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318. As the court observed, "[t]here is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." Id. "Their deficiencies," the court stated, "do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." Id.
 {¶ 6} Aware of the point of controversy in its decision, the court further observed that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. * * * Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, at 317. By footnote, the court described mild mental retardation as typically applied to individuals with an IQ level of 50-55 to 70. Id. at 309, fn. 3.
 {¶ 7} Although Atkins declared execution of the mentally retarded to be unconstitutional, the court did not establish procedures for determining if a person is mentally retarded. Rather, Atkins left to the states the development of appropriate means of enforcing the constitutional restriction.Lott, at ¶ 10. Accordingly, the Ohio Supreme Court in Lott
outlined the procedures to be followed in Ohio when determining whether a defendant is mentally retarded under Atkins.
 {¶ 8} Lott stated the procedures for post-conviction relief outlined in R.C. 2953.21 et seq. provide the statutory framework for reviewing an Atkins claim, and in that framework the court concluded it constitutionally could require that a defendant prove mental retardation by a preponderance of the evidence.Lott, at ¶ 21. In order to take advantage of the preponderance of the evidence standard, as opposed to the clear and convincing standard of proof normally required when filing an untimely or successive petition for post-conviction relief, Lott determined a defendant had to file the claim within 180 days of the Atkins
decision. Lott, at ¶ 24. Defendant filed his petition within the 180-day period.
 {¶ 9} As to the substantive aspects of a defendant's mental retardation claim, Lott determined that "[c]linical definitions of mental retardation, cited with approval in Atkins, provide a standard for evaluating an individual's claim of mental retardation." Lott, at ¶ 12. Following the lead of other states, Lott set forth a three-part test to determine a defendant's mental retardation claim under the principles announced in Atkins. According to Lott, a defendant must demonstrate: (1) significantly sub-average intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. Id. An individual must meet all three requirements to satisfy Lott's definition of mental retardation.
 {¶ 10} Explaining the significance of an IQ to the three-part test it set forth, Lott determined that, although IQ alone is not determinative, "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Id. In support, the court noted that most states prohibiting the execution of mentally retarded persons "require evidence that the individual has an IQ of 70 or below." Id.
 {¶ 11} Lott further ordered trial courts to conduct their own de novo review of the evidence to determine whether a defendant is mentally retarded. "The trial court should rely on professional evaluations of [defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding [the] matter." Id. at ¶ 18. Consistent with the procedures employed in post-conviction proceedings under R.C.2953.21, the court stated that "[t]he trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded." Id. Lastly, the court determined "these matters should be decided by the court and do not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue)." Id.
 {¶ 12} Applying the procedures set forth in Lott, the trial court determined defendant did not meet his burden of proving mental retardation by a preponderance of the evidence. The trial court found defendant failed to demonstrate sub-average intellectual functioning because his full scale IQ was 78, above the cutoff of 70. The trial court did not find persuasive defendant's evidence that the "Flynn effect" inflated his IQ score, and the court similarly refused to account for any standard measurement error reflected in defendant's IQ score. As the trial court explained, "[a]fter due consideration, the Court will not accept the Flynn Effect as being sufficiently authoritative. In addition, neither of the Courts, Lott norAtkins, mention or provide for consideration of the Flynn Effect or margins of error in determining whether a defendant is mentally retarded." (Trial Court Opinion, at 11.) The trial court further found that although defendant has some limitations in various areas of adaptive skills, such limitations may have been due to defendant's alcohol abuse or failure to attend school. In any event, "the adaptive limitations are not significant enough to overcome [defendant's] burden of proof." Id. at 12.
 {¶ 13} According to the evidence defendant presented, defendant's first IQ test, known as a Cattell 3 test, was administered in 1970 when he was nine years old. No overall score was given for that test; instead, a notation stated the test was "too low to score." Upon entering the Ohio Department of Rehabilitation and Correction in 1982 at the age of 21, defendant was given a Beta intelligence test; he scored within a range of 80 to 89. For mitigation purposes at defendant's trial, defense expert psychologist Dr. James P. Reardon tested defendant's IQ in August 1990 using the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"). Defendant's verbal IQ was 76, and his performance IQ was 88, for a full scale IQ of 78. Dr. Reardon also administered the Minnesota Multiphasic Personality Inventory ("MMPI") and the Tennessee Self Concepts Scale. Based on those two tests, Dr. Reardon found that defendant had extreme difficulty in interpersonal and social functioning and had low self-esteem.
 {¶ 14} Based on the WAIS-R test, Dr. Reardon classified defendant in 1990 as borderline mentally retarded and within the lowest six percent of the population. Dr. Reardon also diagnosed defendant as having borderline personality disorder. At the post-conviction relief hearing in April 2004, Dr. Reardon modified his opinion regarding defendant's mental status following additional interviews but no further testing. Dr. Reardon testified that after accounting for the Flynn effect and standard measurement error, defendant is mildly mentally retarded.
 {¶ 15} At the April 2004 hearing, Dr. Reardon described the Flynn effect as a phenomenon claiming that as an intelligence test moves farther from the date on which it is normed, the mean score of the population as a whole on that test increases, thereby inflating an individual's score. Dr. Reardon testified he was unaware of the Flynn effect in 1990, even though the first article on the topic was published in 1984. Dr. Reardon explained that since 1990, much more research has been done to verify the existence of the Flynn effect. Dr. Reardon did not mention at either the 1990 or 2004 hearings whether he accounted for standard measurement error in 1990.
 {¶ 16} At the original trial, Dr. Reardon testified at length to defendant's childhood. Defendant was exposed to a chaotic home situation, where his mother, an alcoholic, left the home when defendant was about five years old. Following her departure, defendant and his two brothers lived alternately with their father and their paternal grandparents. At a fairly early age, defendant was living "a lot on the streets." (Mitigation Tr. Vol. II, at 119.) As Dr. Reardon explained, "I think that this kind of chaos and lack of structure and lack of reassurance and affection and so forth played a very significant role in the formulation of [defendant's] personality. And certainly it was a major factor in a lot of his later behavior and a lot of his later difficulties." Id. at 120. As a result of the lack of structure at home, guidance, and love and affection, defendant, according to Dr. Reardon, was very suspicious and untrusting. In addition to the emotional deficiencies in defendant's childhood, Dr. Reardon testified that defendant had severely crossed eyes at birth. At that time, doctors recommended that defendant have surgery to correct the problem, but the surgery did not occur until defendant was five years old.
 {¶ 17} Dr. Reardon also reviewed defendant's school records. Defendant obtained mostly C's in kindergarten; C's and D's in first grade; C's, D's and F's in second grade and D's and F's in third grade. The school records indicate defendant needed glasses but had no cooperation from home on the issue. Dr. Reardon testified defendant was having trouble in school "largely because he was having vision difficulties." Id. at 122. Defendant's grades went up in the fourth, fifth, and sixth grades to mainly B's and C's, and even a few A's. From the seventh grade forward, however, defendant's grades dropped again to mainly D's and F's. During these years, defendant was absent or tardy a significant number of days.
 {¶ 18} Defendant began using alcohol at age 13. Dr. Reardon stated defendant acknowledged that he is an alcoholic and has been for a long time. From age 13 forward, he drank whatever he could get and whenever he could get it, contributing to his decline in school attendance. Dr. Reardon testified that "[w]hen you look at his school record, it's pretty apparent that around the ninth grade, eighth grade, which would have been within a year or two of when he started doing the alcohol, his attendance at school begins to go downhill." Id. at 130.
 {¶ 19} Dr. Reardon's 1990 testimony that defendant suffered from borderline personality disorder was premised on a diagnosis stemming from defendant's pattern of unstable and intense interpersonal relationships, impulsiveness in terms of criminal behavior and alcohol abuse, volatile mood, inappropriate intense anger or bad temper, marked and persistent identity disturbances, including poor self image, chronic feelings of emptiness and boredom, and frantic efforts to avoid real or imagined abandonment. Defendant had no close friends and relied heavily on his children and Yvette Wilkes, defendant's long-time partner. Dr. Reardon testified defendant had significant limitations in maintaining employment because he did not like to be told what to do and because he abused alcohol. Dr. Reardon stated that defendant is highly self-critical and naïve, although not particularly manipulative.
 {¶ 20} Dr. Reardon testified in the mitigation phase of defendant's 1990 trial that although he could have made a dual diagnosis of borderline personality disorder and anti-social disorder, he did not do so. Dr. Reardon explained that defendant exhibited anti-social traits, but defendant was not a classic anti-social personality because Dr. Reardon felt defendant showed remorse for his actions and was emotional. Dr. Reardon testified that a "true" anti-social has no remorse and lacks emotional capacity. Dr. Reardon concluded defendant could adjust to prison life and could be productive as a father.
 {¶ 21} Defendant testified at length on his own behalf during the 1990 trial. According to defendant, he met the victim at work and lived with him for a short time after defendant and Wilkes had an argument. Defendant repeatedly denied stabbing the victim. Defendant testified his cousin Tanner did the actual stabbing, although defendant did not stop him. Tanner's sister testified she heard Tanner and defendant singing a song the day after the homicide about going to Lucasville because they killed the victim.
 {¶ 22} Defendant testified at the trial that he owned a car in the past and made payments. Defendant further testified that he cooked for his children, changed diapers, and did housework. Defendant stated that after work on the night of the murder, defendant cashed his check and bought a 40-ounce beer. He admitted he was an alcoholic and has had blackouts resulting from alcohol abuse. Defendant also stated he had a bad temper that was made worse from alcohol, and when he was angry, "it's hard to be under control period." (Trial Tr. Vol. V, at 114.) Defendant also admitted that when the police interviewed him after the murder, he did not tell them the whole story.
 {¶ 23} In his fourth, fifth, and sixth assignments of error, defendant challenges the procedures the trial court followed, perLott, to determine whether defendant is mentally retarded. Defendant acknowledges this court is bound by the procedures the Ohio Supreme Court set forth in Lott, supra, and has raised the issues to preserve them for further review.
 {¶ 24} In the fourth assignment of error, defendant claimsLott's rebuttable presumption that defendant is not mentally retarded if his full-scale IQ score is above 70 violates defendant's constitutional rights. Defendant asserts that presumption, as well as Lott's requirement that defendant prove by a preponderance of the evidence he is mentally retarded, are constitutionally impermissible. Despite defendant's arguments, we are bound to adhere to the rules and procedures the Ohio Supreme Court set forth. Cooke v. Montgomery Cty., 158 Ohio App.3d 139,2004-Ohio-3780, at ¶ 39 (noting "[a]ppellate courts are bound by and must follow the decisions of the Ohio Supreme Court, which are regarded as law unless and until reversed or overruled");State v. Tinker, Franklin App. No. 03AP-1203, 2005-Ohio-2289. Because Lott established the rebuttable presumption and placed the burden of proof on defendant, defendant's fourth assignment of error is overruled.
 {¶ 25} In the fifth assignment of error, defendant contends he is entitled to have a new sentencing hearing, with a new jury to determine the death penalty, in order to reflect the national consensus identified in Atkins. Defendant, however, points to nothing in Atkins or Lott that requires the trial court to hold a new sentencing hearing. Rather, if the trial court determines a defendant is mentally retarded, the defendant is not subject to the death penalty. Because nothing in Lott requires a new sentencing hearing, defendant's fifth assignment of error is overruled.
 {¶ 26} Citing Ring v. Arizona (2002), 536 U.S. 584 in support, defendant's sixth assignment of error claims that a jury must act as the fact finder to determine whether defendant is mentally retarded. Again, Lott held the issue of mental retardation is a question of fact for the judge, not a jury, to determine. Because we must follow Ohio Supreme Court precedent, defendant's sixth assignment of error is overruled.
 {¶ 27} In the first assignment of error, defendant raises issues concerning the "Flynn effect" and standard measurement error in connection with defendant's full-scale IQ score of 78. His second assignment of error contends the trial court erred in finding his limitations in adaptive skills did not warrant a finding that defendant is mentally retarded. By the third assignment of error, defendant claims the trial court's conclusion that defendant is not mentally retarded is against the manifest weight of the evidence.
 {¶ 28} A determination of mental retardation involves findings of facts. As such, the reviewing court must determine whether sufficient competent, credible evidence exists to support the trial court's conclusion. State v. Were, Hamilton App. No. C-030485, 2005-Ohio-376. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment." Macklin v. Ohio Dept. of Rehab. Corr., Franklin App. No. 01AP-293, 2002-Ohio-5069, at ¶ 20, citing Estate ofBarbieri v. Evans (1998), 127 Ohio App.3d 207, 211. Under those parameters, we first address defendant's second assignment of error, where he maintains the trial court erred in finding that his limitations in adaptive skills were insufficient to overcome his burden of proof.
 {¶ 29} As stated by the American Association on Mental Retardation ("AAMR"), mental retardation is a disability characterized by significant limitations in both "intellectual functioning and in adaptive behavior." Commonwealth v. Miller
(Pa. 2003), Dauphin App. No. 2775 CD 1992. Adaptive behavior is defined as the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives. Id., citing AAMR 10th Ed. (2002). The adaptive skills element of the three-part Lott test is to ensure that a defendant is not an individual who simply does not perform well on tests, but rather is a truly disabled individual. Id.
 {¶ 30} Although experts offer insightful opinions, the adaptive behavior criteria are subjective, and experts will offer opinions on both sides of the issue. In re Rodriguez (Tex. 2005), 164 S.W.3d 400; In re Briseno (Tex. 2004), 135 S.W.3d 1
(stating that while there is expert opinion testimony in this record that would support a finding of mental retardation, there is also ample expert testimony evidence to support the trial court's finding that the applicant was not mentally retarded);Were, at ¶ 80 (noting expert testimony "that finding a serious deficiency in adaptive behavior required more than just anecdotal evidence").
 {¶ 31} Defendant's AAMR evidence, admitted in the 2004 hearing, cites examples of conceptual, social, and practical skills. Conceptual skills include language, reading, writing, money concepts and self-direction. Examples of social skills include interpersonal relationships, responsibility, self-esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. Practical skills include daily activities such as eating, mobility, bodily elimination, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use. Practical skills also include occupational skills and maintaining a safe environment.
 {¶ 32} In addition to the testimony he offered at the 1990 mitigation hearing, at the April 2004 hearing, Dr. Reardon testified defendant had trouble handling money. Dr. Reardon stated that defendant gave Wilkes his paychecks and usually took some money to buy beer. Although Dr. Reardon concluded that defendant lacked self-direction, overall Dr. Reardon did not feel defendant had significant limitations in conceptual skills or in most daily living tasks included within practical skills, other than employment skills.
 {¶ 33} With respect to social skills, Dr. Reardon testified defendant had significant deficits. According to Dr. Reardon, defendant lacked good interpersonal skills, meaning defendant had limited encounters with family, had very few friends, and had a stormy on-again off-again relationship with Wilkes. Dr. Reardon testified defendant had difficulty maintaining employment, as evidenced by defendant's numerous jobs. According to Dr. Reardon, defendant did not like supervision or being told what to do. He further testified defendant had poor self-esteem, was gullible and was a follower who could easily be tricked or manipulated. Consistent with those observations, Dr. Reardon noted defendant did not avoid victimization, as evidenced by defendant's being stabbed by his older brother. Dr. Reardon opined that defendant was under Tanner's control and followed Tanner's lead on the night of the murder, and he based his opinion on his conversations with defendant and his review of defendant's and Tanner's videotaped interviews with police.
 {¶ 34} The state did not present any expert testimony to discount Dr. Reardon's diagnosis and evaluation of defendant. Rather, the state relied exclusively on its cross-examination of Dr. Reardon. On cross-examination, Dr. Reardon admitted defendant lied to the police in the videotaped interview following the murder. Dr. Reardon acknowledged he based his conclusion that defendant was a follower, manipulated by Tanner, on defendant's version of events. In addition, Dr. Reardon agreed with the prosecution that defendant has "significant antisocial traits," (PCR Tr., at 106) and admitted that many of the deficiencies he discussed are as consistent with anti-social personality traits as with someone who suffers from mental retardation. Dr. Reardon further acknowledged his previous testimony that, given where defendant came from and the way he was reared, it would be difficult for defendant not to have problems with relationships because defendant was not properly socialized.
 {¶ 35} Speaking to defendant's schooling, Dr. Reardon acknowledged a number of things could have affected defendant's school performance other than his being mentally retarded. His improved grades in the fourth, fifth, and sixth grades could be explained by defendant's obtaining glasses, while his subsequently declining grades could be explained by excessive absences and tardiness, in addition to significant alcohol use. Defendant's school records do not indicate he was labeled mentally retarded; nor was defendant recommended for special education classes. Dr. Reardon admitted that many people who lack self-direction are simply anti-social and not mentally retarded.
 {¶ 36} Addressing various aspects of defendant's behavior through the prosecution's cross-examination, Dr. Reardon admitted defendant's affidavit and his writings in prison, including the "kites," or messages, within the prison system, seemed adequate. He nonetheless cautioned that defendant may have taken a long time to write them or may have had assistance. Dr. Reardon agreed, however, that defendant's poor choices regarding money did not necessarily mean he was mentally retarded. Dr. Reardon also acknowledged that defendant initiated the idea of getting a gun to scare not the victim of the murder, but another individual with whom defendant had argued earlier in the day, and that defendant was the one who wanted to go back with Tanner to beat up that individual. Moreover, defendant, not Tanner, was the one whose history was connected to the victim.
 {¶ 37} In the end, a part of Dr. Reardon's testimony supports the trial court's determination that defendant did not suffer significant adaptive limitations as a result of mental retardation. According to Dr. Reardon, defendant's limitations in conceptual and practical skills are not substantial; his deficits manifest themselves in his social skills. Dr. Reardon, however, testified defendant's lack of social skills could be explained by defendant's anti-social traits as opposed to mental retardation. Although defendant displays deficits in his ability to maintain employment, the evidence allowed the trial court reasonably to conclude that defendant's limitations were not a result of mental retardation, but the lack of structure and guidance in defendant's childhood and his "anti-social" traits. Indeed, other evidence reflects defendant played and coached football, is capable of taking care of his children, and is a good father. Defendant's school records indicate he received average and above average grades in regular classes during the fourth, fifth, and sixth grades; his grades then fell, but at the same time defendant had poor attendance and was "living on the streets." Given the evidence, the trial court could conclude defendant's deficiencies were as easily a result of defendant's bad temper and aggressive tendencies resulting from alcohol abuse and living on the streets as from mental retardation.
 {¶ 38} Further, defendant's trial testimony indicates he clearly understood the questions posed by his counsel as well as those the prosecution posed. Indeed, during cross-examination, defendant often became impatient and irritated, answering the prosecution's questions with his own question. Briseno, supra (holding that defendant failed to establish significant limitations in adaptive functioning where his behavior showed good survival skills in response to a chaotic home environment, defendant's repeated criminal conduct was consistent with anti-social personality disorder, prison officials testified defendant behaved normally, and defendant testified clearly, coherently, and responsively at Atkins hearing); Were, supra (holding no significant limitations in adaptive skills where defendant rose to leadership positions in prison gang, was articulate in court and wrote and presented motions, and defendant had no significant limitations in communication, daily living skills, or socialization).
 {¶ 39} Defendant suggests mental retardation has many different origins and the inquiry is whether a real world impact results from the intellectual impairment. Defendant states, "[t]he fact that there is a possibility of an alternative source for one or more of the adaptive limitations does not preclude a mental retardation diagnosis." (Appellant's Brief, at 24.) While defendant's suggestion is legitimate, it does not follow that every individual who exhibits some limitations in adaptive skills is mentally retarded. Mental retardation, even mild retardation, is not a common occurrence. Atkins, supra (noting only one to three percent of the population is so limited as to be classified as such). Defendant still must prove that significant adaptive limitations more likely than not result from mental retardation.Atkins; Lott, supra.
 {¶ 40} Other courts have ruled that where sufficient evidence demonstrates an alternative explanation to mental retardation, a finding of mental retardation is not mandated. In re Bowling
(C.A.6, 2005), 422 F.3d 434 (denying defendant's application under Atkins where his IQ was above 70 and evidence "that he has limitations [is] just as indicative of the other psychological disorders from which he suffers [alcohol abuse, personality disorder, and attention deficit hyperactivity disorder] as they are of low level intellectual functioning");In re Rodriguez, supra (stating that Atkins applicant's history of inhalant abuse and unfortunate upbringing leading to anti-social traits may be the cause of limitations in adaptive skills as opposed to applicant's being mentally retarded); Blackv. State (Tenn. 2005), App. No. M2004-01345-CCA-R3-PD (noting expert testimony that defendant suffered from personality problems or psychological difficulties are issues separate and apart from whether defendant was mentally retarded); Briseno,
supra (observing the evidence suggested that defendant's behavior was consistent with anti-social personality disorder rather than mental retardation).
 {¶ 41} Because the record contains competent, credible evidence to support the trial court's finding, defendant's second assignment or error, premised on the record before us, is overruled. Because defendant must prove all three prongs of theLott test, his third assignment of error, contending the trial court's conclusion that defendant is not mentally retarded is against the manifest weight of the evidence, is also overruled.
 {¶ 42} In the seventh assignment of error, defendant contends the trial court erred in refusing to appoint two attorneys to represent him in this capital post-conviction proceeding. Defendant points out that the Lott procedures apply equally to both capitally charged indigent defendants and capitally charged post-conviction defendants. Noting that capitally charged indigent defendants pursuing a defense under Atkins are entitled to two attorneys, defendant contends two attorneys must be appointed to indigent defendants pursuing an Atkins defense for the first time, even if under post-conviction relief procedures.
 {¶ 43} At least one Ohio court has addressed the issue defendant raises. State v. Lorraine, Trumbull App. No. 2003-T-0159, 2005-Ohio-2529. In Lorraine, the court held that "a capital defendant is entitled to the appointment of two certified attorneys when an Atkins claim is raised for the first time in a post conviction petition." Lorraine, at ¶ 51. The defendant In Lorraine argued that because an Atkins claim presents a new constitutional issue, appointment of counsel was warranted in accordance with Sup.R. 20. The state argued that a capital defendant has no right to appointed counsel in post-conviction proceedings because such proceedings are civil in nature. Id.
 {¶ 44} Sup.R. 20 provides for appointment of counsel for indigent defendants that have "been charged with or convicted of an offense for which the death penalty can be or has been imposed." Sup.R. 20(A). Under those circumstances, "the court shall appoint two attorneys certified pursuant to this rule." Sup.R. 20(C). Applying Sup.R. 20, Lorraine concluded that after conviction and imposition of the death sentence, the indigent defendant asserting a first-time Atkins claim maintains the right to two attorneys. Lorraine, supra.
 {¶ 45} Explaining, the court acknowledged post-conviction proceedings have long been held to be civil in nature. It nonetheless concluded the Atkins and Lott cases "when read in context with Sup.R. 20 appear to establish a special category for the appointment of counsel regarding the determination of mental retardation in capital cases, which would require the appointment of two certified attorneys to represent a capital defendant in aLott case undertaking." Lorraine, at ¶ 49. The court premised its conclusion particularly on the fact the constitutional issue raised under Atkins and Lott was not and could not have been previously litigated to the extent now authorized. Id. at ¶ 50. Noting the Lott court recognized the significance of "this first opportunity" to raise the issue and held that an Atkins
claim is not barred by res judicata, Lorraine concludedLott's preservation of the constitutional claim underscored "the importance of providing a capital defendant with the opportunity to fully present his constitutional issue, even in the post-conviction context." Id.
 {¶ 46} Pursuant to Lorraine, coupled with Lott, an indigent capital defendant raising an Atkins claim for the first time in a post-conviction petition filed within 180 days after Atkins, should be afforded the same opportunity "to fully present his constitutional issue" that is afforded a capital defendant who now is able to raise the issue at trial. An appeal of a first time Atkins petition is akin to a direct appeal of the issue, and in a direct appeal defendant would be entitled to two attorneys. Accordingly, we hold an indigent capital defendant raising an Atkins claim for the first time in a post-conviction proceeding is entitled to be represented by two certified attorneys. Defendant's seventh assignment of error is sustained.
 {¶ 47} Because this matter must go back for a hearing, we address defendant's first assignment of error and the state's assignment of error on cross-appeal to the extent of determining whether the trial court properly should admit evidence regarding the Flynn effect and the standard margin of error as they relate to IQ assessment.
 {¶ 48} In the first assignment of error, defendant contends the trial court improperly refused to find the "Flynn effect" sufficiently authoritative and improperly refused to consider standard margins of error in connection with petitioner's full-scale IQ score of 78. The trial court found petitioner did not satisfy the first criteria of the three-part test enunciated in Lott because petitioner "has an IQ of 78, well above the 70 required for the rebuttable presumption." (Trial Court Opinion, at 12.) Defendant contends that, had the trial court considered the Flynn effect and measurement error, his IQ score would be 70, satisfying the first part of the three-part test.
 {¶ 49} Although the case law specifically addressing the subject is sparse, a few courts have commented on or specifically decided the issue. The Fourth Circuit held that a trial court must consider evidence of the Flynn effect and determine "the persuasiveness" of the evidence. Walker v. True (C.A.4, 2005),399 F.3d 315; Walton v. Johnson (C.A.4, 2005), 407 F.3d 285. California recognizes that the Flynn effect must be considered when assessing an individual's IQ. People v. Superior Court
(Calif. 2005), 28 Cal.Rptr.3d 529, 558-559, overruled on other grounds (stating that, "[i]n determining a petitioner's IQ score, consideration must be given to the so-called Flynn effect"); Inre Hawthorne (Calif. 2005), 24 Cal.Rptr.3d 189 (finding that mental retardation is not measured according to a fixed intelligence test score but constitutes an assessment of overall capacity based on a consideration of all relevant evidence).
 {¶ 50} In State v. Murphy, Marion App. No. 9-04-36,2005-Ohio-423, the defense expert testified to the defendant's IQ and took into account the Flynn effect; the state's expert did not mention it. The trial court found the defendant was not significantly lacking in adaptive skills and did not discuss whether the Flynn effect was considered. On the other hand, the Supreme Court of Kentucky has held that because its statute sets an IQ score of 70 as the cutoff and the statute is unambiguous, neither the Flynn effect nor standard margins of error properly are considered. Bowling v. Commonwealth (Ky. 2005),163 S.W.3d 361. Tennessee has similarly ruled. Howell v. State (Tenn. 2004), 151 S.W.3d 450, 456 (holding that the statute setting a bright-line cutoff at 70 should not be interpreted to make allowances for measurement error or "other circumstances whereby a person with an IQ above seventy could be considered mentally retarded").
 {¶ 51} Here, although the trial court's decision is subject to differing interpretations, it appears the trial court considered the testimony of Dr. Reardon, the defense expert, regarding the Flynn effect. Indeed, the trial court directed specific questions to Dr. Reardon at the post-conviction hearing, and after due consideration the trial court determined Dr. Reardon's testimony was not persuasive. We conclude that a trial court must consider evidence presented on the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score. The AAMR, a leading authority on the definition of mental retardation, does not suggest that an IQ score must reflect adjustment for the Flynn effect.
 {¶ 52} Defendant also contends the trial court improperly refused to apply any measurement error in this case. According to the AAMR, any IQ score must be adjusted to account for measurement error. In discussing Atkins claims, courts have recognized that intelligence tests have some level of measurement error depending on the test given. In re Hawthorne (noting that IQ test scores are imprecise and are considered to have measurement error); State v. Williams (La. 2002), 831 So.2d 835
(observing that any IQ test must account for standard margins of error); Miller, supra; In re Bowling, at 442, dissenting opinion (noting "there appears to be considerable evidence that irrebuttable IQ ceilings are inconsistent with current generally-accepted clinical definitions of mental retardation and that any IQ thresholds that are used should take into account factors, such as a test's margin of error, that impact the accuracy of a particular test score"); Walker, supra (holding that on remand the trial court must consider whether the Virginia statute permits consideration of measurement error).
 {¶ 53} In accord with the AAMR's standard, measurement error must be considered in determining an individual's IQ score. Unlike Kentucky and Tennessee, Ohio has not established an absolute cutoff IQ score to determine mental retardation. Rather,Lott adopted a rebuttable presumption that an individual is not mentally retarded if his or her IQ score is above 70. Accounting for measurement error is one way to rebut the presumption. In reBowling, supra, dissenting opinion (noting Ohio's rebuttable
presumption in relation to IQ scores as opposed to an absolute cutoff score). Indeed, in Lott, the Supreme Court observed the petitioner's claim that he was mentally retarded was based on an IQ score of 72 after taking into account a five-point margin of error. Although Lott did not specifically state that measurement error must be considered, the court remanded the matter to the trial court for a hearing on mental retardation and mandated application of a rebuttable presumption.
 {¶ 54} In the final analysis, the AAMR standard requires adjustment of IQ scores to account for a margin of error. Thus, we conclude the trial court must adjust, however nominally, an IQ score for measurement error and consider an expert's testimony regarding size or degree of the measurement error applicable to the particular intelligence test. In this case, the court erred in failing to consider Dr. Reardon's testimony regarding measurement error. Because the Flynn effect is a proper subject for evidentiary proof, and because the trial court must consider standard margin of error in determining defendant's IQ, we sustain to that extent defendant's first assignment of error and overrule the state's assignment of error on cross-appeal.
 {¶ 55} Having overruled defendant's second, third, fourth, fifth, and sixth assignments of error and the state's assignment of error on cross-appeal, but having sustained defendant's seventh assignment of error and his first assignment of error to the extent indicated, we reverse the judgment of the trial court and remand this matter to the trial court for a new Atkins
hearing consistent with this opinion.
Judgment reversed and case remanded.
Brown, P.J., concurs.
McGrath, J., dissents.