IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-38,198-03






EX PARTE JULIUS JEROME MURPHY, Applicant






ON SUBSEQUENT APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 97-F-462-102 FROM THE


102
ND DISTRICT COURT OF BOWIE COUNTY






 Cochran, J., filed a concurring statement in which Price and Hervey, JJ., joined.


CONCURRING STATEMENT 



 Based upon the affidavits attached to his application, I agree that applicant has made
a prima facie showing of mental retardation under Atkins, (1) and thus we should remand this
case to the trial court for further consideration. I am, however, concerned that applicant
claims that he is mentally retarded even though the only intelligence test score that he relies
upon is one that shows his over-all I.Q. as being 81. This score is well above the generally
accepted cut-off score of 70 for the mildly mental retarded.

 Applicant relies on a purported "Flynn effect" and the statistical margin of error to
argue that his "true" I.Q. might be as low at 69. (2) It is on this basis that applicant asserts that
he has made a prima facie showing of the first prong of mental retardation.

 Discussion of the Flynn effect has, since the Atkins decision, suddenly come to the
fore of death-penalty mental-retardation claims. (3) According to the description by one court, 

 "Ever since the introduction of standardized IQ tests in the early 20th century,
there has been a systematic and pervasive rise in IQ scores all over the world,
including the United States. Known as the Flynn effect ... , [it] causes IQ test
norms to become obsolete over time [citations]. In other words, as time passes
and IQ test norms get older, people perform better and better on the test,
raising the mean IQ by several points within a matter of years. Once a test is
renormed, which typically happens every 15-20 years, the mean is reset to 100,
making the test harder and 'hiding' the previous gains in IQ scores." (4)


Thus, if the Flynn effect is credited, "[g]ains on the Wechsler scales are approximately 0.311
points per year; '[a]lthough there is not a consensus among professionals as to why these
gains are occurring or what these gains actually mean (e.g., are we really getting smarter?),
all are in agreement that the gains occur ... .'" (5) However, at least one court has stated that
the American Association of Mental Retardation (AAMR) "does not suggest that an IQ score
must reflect adjustment for the Flynn effect." (6) Furthermore, "[t]he scientific community does
not agree on the cause of this phenomenon." (7) 

 Mr. Flynn, a political scientist residing in New Zealand, attributes his namesake effect
to environmental factors such as "the advent of television and the greater cognizant demands
of industrial development." (8) Mr. Flynn states that "[t]he hypothesis that best fits the results
is that IQ tests do not measure intelligence but rather correlate with a weak causal link to
intelligence." (9)
 According to one unscientific source, Mr. Flynn "concluded that someone
who scored among the best 10% a hundred years ago, would nowadays be categorized among
the 5% weakest. That means that someone who would be considered bright a century ago,
should now be considered a moron!" (10) 

 There is something intuitively illogical about this argument, but perhaps there is a
sound scientific basis for it. (11) If so, what impact, if any, does (or should) this Flynn effect
have upon the determination of whether a person standing trial today is so mentally retarded
that it would violate the Eighth Amendment to execute him regardless of all other facts that
might militate in favor of the death penalty? Do, as Mr. Flynn posits, I.Q. tests have merely
a "weak correlation" with actual intelligence? Do I.Q. tests accurately reflect a person's
ability to function in society? To be morally cognizant and culpable for his criminal
conduct? Should the legal standard for determining mental retardation for Eighth
Amendment purposes rely upon I.Q. test scores (and if so should that reliance be based upon
the highest score, the lowest, the most recent, an average of all scores, the raw score, a score
that has been recalculated by taking into account the Flynn effect and/or the standard
deviation of error, one that is a specific number or that falls within a range- and, if so, what
range) as part of its definition or should the fact-finder focus solely upon a person's
childhood or adult behavior and cognitive abilities? For if, in fact, I.Q. scores are so
unreliable in measuring actual mental functioning that an over-all test score of 81 may be
equivalent to an actual I.Q. of 69, perhaps the use of I.Q. test scores is a scientifically
inappropriate means of measuring mental retardation. The result may be that, for purposes
of Atkins, what juries and courts need is a "reasonable man" assessment of mental
competence as opposed to a statistician's.

 These are questions upon which the parties in this case might wish to offer
documentary evidence and testimony so that the trial court and this Court may make the
ultimate factual determination of whether applicant is so mentally impaired that he is exempt
from the death penalty under the Eighth Amendment to the United States Constitution. The
ultimate question that must be decided is not whether a person has a certain specific I.Q. test
score or whether that person's measured I.Q. score might qualify him for the receipt of
additional social services or special educational assistance, but rather whether he is so
mentally deficient that he ought not be held fully morally accountable for his criminal
conduct.

 I therefore join in the Court's decision to grant applicant's request for a stay of
execution and to remand this case to the trial court for further evidentiary development on
these issues.


Filed: January 18, 2006

Do Not Publish
1. Atkins v. Virginia, 536 U.S. 304 (2002).
2. Applicant asserts that approximately 6 points should be shaved off of his 1998 I.Q. test
score because the version of the test he took, the WAIS-R, was normed twenty years earlier and
thus reflected a person's "true" intelligence level only at the time it was normed. He claims that
another 5-6 points should be shaved off to account for the possible statistical margin of
measurement error. And then, because that brings his I.Q. score down into the possible range of
69-75, he may be considered mentally retarded as falling within the range of those considered
mildly mentally retarded under the first American Association for Mental Retardation criterion. 
3. See, e.g., Walton v. Johnson, 407 F.3d 285, 295-97 (4th Cir. 2005) (capital murder
defendant claimed that his I.Q. tests of 90 and 77 were really within range of mental retardation
taking into account "the Flynn effect" and the statistical margin of error); Walker v. True, 399
F.3d 315 (4th Cir. 2005), after remand, 401 F.3d 574 (4th Cir. 2005); In re Hicks, 375 F.3d 1237
(11th Cir. 2004); People v. Superior Court (Vidal), 129 Cal. App. 4th 434, 28 Cal. Rptr. 3d 529
(5th Ct. App. 2005), vacated and later proceeding at People v. S.C., 2005 Cal. LEXIS 13290
(Cal., Nov. 17, 2005); Bowling v. Commonwealth, 163 S.W.3d 361, (Ky. 2005); State v. Burke,
2005 Ohio 7020 (2005); State v. Murphy, 2005 Ohio 423 (2005); Myers v. State, 278 P. 1106
(Okla. 2005); Black v. State, No. M2004-01345-CCA-R3-PD, 2005 Tenn. Crim. App. LEXIS
1129 (Tenn. 2005).
4. People v Superior Court, 129 Cal. App. 4th at 471 (quoting Kanaya et al., The Flynn
Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental
Retardation Diagnoses, American Psychologist, at 778 (Oct. 2003)).
5. Id.
6. Burke, 2005 Ohio 7020, P51.
7. Bowling, 163 S.W.3d at 374, n. 12.
8. Id. (citing James R. Flynn & William T. Dickens, Heritability Estimates Versus Large
Environmental Effects: The IQ Paradox Resolved, 108 Psych. Rev. 346 (April 2001)). Others
have attributed it to better nutrition. Id. (citing Richard Lynn, The Role of Nutrition in Secular
Increases in Intelligence, 11 Personality & Individual Differences 273-85 (1990 No. 3).
9. Flynn, J. R., Massive IQ Gains in 14 Nations: What IQ Tests Really Measure,
Psychological Bulletin, 101,171-191 (1987) (found at
http://www.indiana.edu/~intell/flynneffect.shtml#Flynn87) (last visited on Jan. 18, 2006).

10. F. Heylighen, Increasing Intelligence: The Flynn Effect, Principia Cybernetica Web
(Aug. 22, 2000) at http://pespmc1.vub.ac.be/FLYNNEFF.html (last visited January 18, 2006). 
This same source explains that

 Older people tend to have lower scores on IQ tests than younger people. Until
now, it was always assumed that this means that intelligence diminishes with age.
However, this observation can be explained as well by noting that older people
were raised in a period when the general level of intelligence was lower. Flynn
showed that if people's IQ is evaluated with tests calibrated for the period during
which they grew up, an old person scores as well as a young one. The reason that
older people do less well on IQ tests is not that they have become more stupid
with age, but that the younger generation simply got a head start. 

Id.
11. See generally, Stephen J. Ceci, So Near and Yet So Far: Lingering Questions About the
Use of Measures of General Intelligence for College Admission and Employment Screening, 6
Psych. Pub. Pol. and L. 233, 245-46 (March 2000) (discussing Flynn effect and reasons why,
even when I.Q. tests are re-normed, the number of mental retardation classifications do not
immediately increase); see also Linda Knauss & Joshua Kutinsky, Into the Briar Patch: Ethical
Dilemmas Facing Psychologists Following Atkins v. Virginia, 11 Widener L.Rev. 121, 127-28
(2004) (noting the Flynn effect and stating that "[e]ach time an IQ test is re-normed, a
generalized lowering of IQ scores occurs because the new norms recalibrate the average IQ. This
removes the increases that accumulated over the previous norming cycle. So, if 2.27% of the
population is diagnosed as MR in the year an IQ test is normed, then each subsequent year fewer
people will score in the MR range due to the tendency for scores to rise. This will continue until
new norms once again come into use. Thus, we can expect an increase in MR diagnoses each
time new IQ norms are published[,]" but concluding that "these documented changes in IQ
scores occur in the absence of any meaningful change in the intellectual ability of the individuals
affected. Any inconsistencies most likely result from imperfections in our tools and data, rather
than from actual changes in the intellectual abilities of those being tested") (footnotes omitted).