IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,795






EX PARTE GREGORY VAN ALSTYNE, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 30,941-02-B FROM THE


181
ST DISTRICT COURT OF POTTER COUNTY






 Per Curiam. Keller, P.J., filed a dissenting opinion in which Keasler and
Hervey, JJ., joined.


O P I N I O N



 This is a subsequent application for writ of habeas corpus in a capital case, in which the
applicant claims that he cannot be subjected to the death penalty, consistent with Atkins v.
Virginia, (1) because he is mentally retarded. This Court found that the application satisfied the
requirements for a subsequent writ under Article 11.071, Section 5, and remanded the cause
to the convicting court for further proceedings. The convicting court held an evidentiary
hearing in late August of 2005, after which it made recommended findings of fact and
conclusions of law, recommending that the applicant's sentence be reduced to life
imprisonment because he is mentally retarded and therefore cannot be executed consonant with
the Eighth Amendment's ban on cruel and unusual punishment. After our own independent
review of the record, we will follow that recommendation. 

THE LEGAL STANDARD

 For purposes of Atkins review in Texas, we have defined mental retardation to be "1)
significant sub-average general intellectual functioning, usually evidence by an IQ score below
70, that is accompanied by, 2) related limitations in adaptive functioning, 3) the onset of which
occurs prior to the age of 18." (2) In post-conviction habeas corpus review, this Court is the
ultimate fact finder. (3) Nevertheless, the convicting court is the "original factfinder" in post-conviction habeas corpus proceedings, (4) and as a matter of course this Court pays great
deference to the convicting court's recommended findings of fact and conclusions of law, as
long as they are supported by the record, particularly in those matters with regard to the weight
and credibility of the witnesses and, in the case of expert witnesses, the level and scope of
their expertise. (5)

 In cases in which the evidence could support both a finding that the habeas applicant has
shown by a preponderance of the evidence that he is mentally retarded and a finding that he has
failed to show he is mentally retarded to that level of confidence, we have typically deferred
to the recommendation of the convicting court, whatever that might be. (6) In the instant case,
the convicting court has considered records from the Texas Department of Criminal Justice
(TDCJ) and affidavits from various experts and lay people and has conducted an evidentiary
hearing. It has recommended, based upon conflicting evidence, that we find that the applicant
has demonstrated to the requisite level of confidence that he is mentally retarded. (7) We see no
compelling reason to reject that recommendation.


APPLICATION OF LAW TO FACTS

Significant Sub-Average Intellectual Functioning

 Born in 1966, the applicant has had his IQ tested via various psychometric instruments
at least six times between 1989 and 2003. Each time he scored in the range of mild mental
retardation. During his first incarceration in TDCJ, beginning in 1989, his full-scale score on
the Wechsler Adult Intelligence Scales-Revised was a 69. Other standardized tests conducted
by the prison system also placed the applicant in the mild mental-retardation range. Fourteen
years later, on November 1, 2003, the applicant's own expert, Dr. Antolin Llorente, obtained
an identical full-scale score when he administered the Wechsler Abbreviated Scale of
Intelligence to the applicant. Ten days later, on November 11, 2003, the State's expert, Dr.
David Edgerton, administered the Wechsler Adult Intelligence Scale-IV to the applicant,
obtaining a full-scale score of 56. Edgerton testified that the discrepancy in the results he
obtained caused him some concern about the possibility of malingering on the applicant's part,
but admitted that he had administered none of the available instruments that are designed to
help detect malingering. (8) He conceded that the evidence that the applicant had presented would
support a finding that the applicant's IQ scores fall within the range of mild mental retardation. (9) 
Thus, the record amply supports the convicting court's finding that the applicant has
demonstrated to the requisite level of confidence that he has significant sub-average
intellectual functioning and therefore satisfies the first criteria for mental retardation.

Adaptive Deficits/Age of Onset

 Unlike the question of the applicant's IQ, the question whether he manifests adaptive
deficits was hotly contested. The applicant relied primarily upon an affidavit and report from
Dr. Richard Garnett. Dr. Garnett conducted a three-hour clinical interview with the applicant,
from which he concluded that the applicant's thinking is highly concrete, and his ability to
reason abstractly, impaired. (10) After reviewing, inter alia, 1) evidence from the punishment
phase of the applicant's trial, 2) affidavits from family members who grew up with and around
the applicant in the Philippines, 3) affidavits of various benefactors who helped him once he
came to the United States, 4) social-security records outlining his sketchy employment record,
and 5) prison records, Garnett opined that the applicant "has exhibited a life-long pattern of
substandard functioning in all areas of daily living: conceptual, social, and practical." He
concluded that the applicant "has indeed demonstrated significant deficits in adaptive
functioning."

 The record supports this conclusion with anecdotal and documentary evidence from
various sources that the applicant, inter alia:


 was born a "blue baby" with the umbilical cord around his neck

 was developmentally slow as a child, walking for the first time at the age
of two and talking for the first time at four

 suffered a head injury and was struck by lightening as a child

 did extremely poorly in school in the Philippines

 displayed grossly deficient personal hygiene and table manners

 could not be taught, once he came to the United States, how to perform
relatively simple tasks such as operating a washing machine, mowing the
lawn, or driving a car, and never obtained a driver's license

 could not find his way around the city, could not cook for himself, ate
spoiled food, did not understand the value of, or how to manage, money,
and apparently did not know how to pay bills

 could not find a job on his own, and could not keep even menial jobs that
someone else helped him find for more than five weeks at a time, earning
less than $1500 over the course of two years

 once he no longer lived with a benefactor, could not live on his own for
more than a few weeks at a time without getting into serious trouble and
going to prison.



Even the State's expert, Dr. Edgerton, acknowledged at the evidentiary hearing that this record,
if reliable, would support a diagnosis of mental retardation. (11)

 The State took the position at the evidentiary hearing that the affidavits supporting Dr.
Garnett's conclusion with respect to adaptive deficits were not reliable. Edgerton pointed to
internal inconsistencies within individual affidavits as well as inconsistencies among the
various affidavits and concluded that there was a significant danger of exaggeration from the
informants. He noted that, although the applicant's 1989 IQ tests had prompted the prison
system to evaluate him for special services, TDCJ had ultimately concluded, on the basis of
further evaluation, including administration of the Vineland test for adaptive deficits, that he
could function adequately in the regular prison population. (12) Edgerton believed that the data
more closely supported a diagnosis of conduct disorder and concluded that the applicant did
not manifest a sufficient level or breadth of adaptive dysfunction to ultimately justify a
diagnosis of mild mental retardation.

 The applicant countered with evidence that the TDCJ evaluation itself was unreliable
because the data underlying the Vineland score had originated with the applicant himself, rather
than from knowledgeable third-party sources as is the standard protocol. It was documented
that much of the information that the applicant had supplied to the TDCJ evaluators
inaccurately overstated his adaptive abilities. For example, the applicant had told the evaluators
that he had graduated from an apparently non-existent high school, that he had been an "A"
student, that he had spent three months in the Marine Corps when in fact there is no record of
any military service, and that he had been employed as a commercial truck driver when in fact
he had never had a driver's license. Moreover, the applicant established that, even if he could
be diagnosed with conduct disorder (which Edgerton did not purport to do, testifying only that
he thought it probable that a full work-up would result in that diagnosis), such a diagnosis
would not exclude a concurrent diagnosis of mental retardation. (13)

 In his report, Dr. Garnett also evaluated the applicant according to the non-diagnostic
criteria this Court identified in Ex parte Briseno. (14) The convicting court has made extensive
findings with respect to these criteria. The record supports the convicting court's findings
that: 1) the applicant's participation in the offense for which he is on death row was
spontaneous, rather than planned; (15) 2) that his conduct in general is impulsive; (16) 3) that he is
uniformly reported to be gullible and a follower rather than a leader; (17) and 4) that he was unable
to lie or hide facts in his own interest. (18)

 On this state of the record, the convicting court was justified in finding by a
preponderance of the evidence that the applicant has established adaptive deficits over the
course of his lifetime (including during the developmental period) sufficient to show he is
mildly mentally retarded.

The Media Interview

 The dissenters disagree and would have us assert our prerogative as the ultimate (if not
the original) finders of fact to reject the convicting court's recommendation. They believe that
a recorded interview, approximately thirty-seven minutes long, that applicant gave to an
Amarillo television reporter, conclusively demonstrates that he is not mentally retarded. As
with Justice Stewart's assertion about hard-core pornography, they "know [mental retardation]
when [they] see it," and the applicant "is not that[.]" (19)

 The convicting court did not ignore the media interview-far from it. After the
evidentiary hearing was concluded, the convicting court allowed the parties to file additional
affidavits from their experts in which they assessed the significance of the applicant's
performance in the recorded interview and explained how they thought it supports their
respective positions with regard to whether the applicant is mentally retarded. Tellingly,
however, none of the experts purported to be able to determine, based upon viewing the
television interview alone, whether the applicant is mentally retarded. Indeed, we are unaware
of any mental health experts who purport to be able to diagnose mental retardation, or the lack
thereof, based solely upon viewing a videotaped interview.

 The convicting court addressed the television interview at some length in its findings
of fact and conclusions of law. The convicting court regarded the interview as relevant
specifically in the context of one of the Briseno factors, viz: Does the applicant respond
coherently, rationally, and on point to oral or written questions or do his responses wander
from subject to subject? (20) In its recommended findings of fact and conclusions of law, the
convicting court judge noted with obvious trepidation the conflicting opinions of the experts
with respect to the interview. He remarked that to his untrained eye the applicant's responses
did not seem "indicative of mental retardation." But he also noted that during the course of the
interview the applicant did not respond in a spontaneous way to questions, but instead "just
started talking." The interviewer asked few questions, testifying that for the most part she just
let the applicant talk about whatever topics he chose. The convicting court noted the
possibility that the applicant's apparent fluidity during the interview may simply have reflected
"a learned by rote understanding of his case which he [was] then able to repeat when given an
opportunity" after he had spent eleven years on death row communicating with his various
lawyers. Unable firmly to resolve its ambivalence with respect to this particular Briseno
factor, (21) the convicting court ultimately relied upon the totality of the evidence as it bore upon
all of the other relevant criteria to conclude that the applicant had demonstrated adaptive
deficits to the requisite level of confidence.

 We believe this was the right approach. Both the American Bar Association and the
State Bar of Texas recognize the important role of experts in screening defendants for mental
health issues, including mental retardation. (22) There is a reason that mental-health experts are
important to this process; mildly mentally retarded individuals often learn to disguise their
disabilities in a so-called "cloak of competence." (23) It is true, of course, that experts do not
make the ultimate determination with respect to mental retardation; the convicting court as
original fact finder makes the ultimate determination with respect to mental retardation, based
upon all of the evidence and determinations of credibility. (24) Nevertheless, we cannot fault the
convicting court judge for entertaining a healthy scepticism of his own ability to gauge mental
retardation, vel non, based upon nothing more than his intuitive assessment of the appellant's
performance during the media interview.

 We, too, have viewed the media interview. To our untrained eye, it conclusively
demonstrates neither that the applicant is mentally retarded, nor that he is not. Under the
circumstances, the convicting court was justified in relying upon the expert assessment of Dr.
Garnett, who has thirty-five years of professional experience as a diagnostician in the field of
mental retardation. From his three-hour clinical interview of the applicant, in combination
with the results of the IQ testing and his review of the other evidence of adaptive deficits
summarized above, Garnett concluded that the applicant is mentally retarded. In his expert
opinion, the thirty-seven-minute media interview corroborated that conclusion. Not
surprisingly, Dr. Edgerton drew a different conclusion and thought that the media interview
corroborated his own, contrary view. This means that the record would also support a
reasonable jurist's conclusion that the applicant has not established mental retardation by a
preponderance of the evidence. On such a state of the record, we typically defer to the
recommended findings and conclusions of the convicting court-here, that the evidence
preponderates in favor of a finding that the applicant is mentally retarded.

CONCLUSION

 The record supports the convicting court's findings of fact and conclusions of law, and,
with one caveat, we adopt them. (25) Accordingly, we accept the convicting court's conclusion
that the applicant has shown, by a preponderance of the evidence, that he falls within the range
of mentally retarded offenders about whom there is a national consensus that they should not
be executed. Relief is granted, and the applicant's sentence is reformed to a term of life
imprisonment.


Delivered: November 14, 2007

Publish
1. 536 U.S. 304 (2002).
2. Ex parte Blue, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007). See also Briseno v. State, 135
S.W.3d 1, 7 (Tex. Crim. App. 2004); Ex parte Modden, 147 S.W.3d 293, 296 (Tex. Crim. App. 2004);
Howard v. State, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004).
3. Ex parte Adams, 768 S.W.2d 281, 288 (Tex. Crim. App. 1989); Ex parte Brandley, 781
S.W.2d 886, 887-88 (Tex. Crim. App. 1989).
4. Ex parte Simpson, 136 S.W.3d 660, 669 (Tex. Crim. App. 2004).
5. See Ex parte Rodriguez, 164 S.W.3d 400, 405 n.5 (Tex. Crim. App. 2005) (Cochran, J.,
concurring); Ex parte Lewis, 223 S.W.3d 372, 374 n.4 (Tex. Crim. App. 2006) (Cochran, J.,
concurring).
6. E.g., Ex parte Rodriguez, supra; Ex parte Lewis, supra; Ex parte Bell, 152 S.W.3d 103 (Tex.
Crim. App. 2004); Ex parte Valdez, 158 S.W.3d 438 (Tex. Crim. App. 2004).
7. Indeed, in its recommended findings of fact and conclusions of law, the convicting court concluded
that the applicant had met all three of the criteria for mental retardation to a level of confidence beyond a
reasonable doubt. This is so even though the convicting court had earlier declared, on the first page of
its recommended findings and conclusions, that "[a]ll findings here are based upon a preponderance of the
evidence[.]" We express no opinion with respect to whether the applicant has indeed proven mental
retardation beyond a reasonable doubt, but note that a finding sufficient to satisfy this level of confidence
would, a fortiori, demonstrate a finding by a preponderance of the evidence, which is the standard
applicable to a showing of mental retardation in the habeas corpus context. See Ex parte Briseno, supra,
at 12.
8. As the convicting court noted in its recommended findings, when Dr. Llorente tested the
applicant's IQ on November 1, 2003, he apparently did administer tests to assess the possibility of that
the applicant was malingering. "The results of these procedures revealed that [the applicant] was being
straightforward in his responses to test items." Thus, regardless of whether the applicant may have been
malingering in an attempt to obtain a lower score ten days later with Dr. Edgerton, the test results obtained
by Llorente, placing the applicant within the range of the mildly mentally retarded, remain valid.
9. Under questioning by the State, Edgerton testified with respect to the first component of the
diagnosis for mental retardation:


 Q. Did you, in looking at everything, the testing from the prison, the testing with
defense counsel and your personal observations, et cetera, do you have an opinion as to
approximately where the defendant's true IQ or these testing procedures probably fell?


 A. It is my opinion that he does not fall in the moderate range at all. If there is
mental retardation or if there are scores in that range, it would be in the high, mild range. 
I would say high, mild retarded, low, medium borderline.


 Q. The 69 score that the defense doctor got clearly fits with what you see with
regard to this defendant?


 A. Yes.


 Q. And again, of necessity, we talk about this is the mental retardation IQ range,
but that does not mean he was mentally retarded, agreed?


 A. Agreed. It does not mean that.


 Q. So we are not going to take issue with the 69 . . . .


Later the State returned to this line of questioning:


 Q. The - I also want to talk about again the IQ test. I want to make it clear. We
are not contesting where his IQ level falls, are we?


 A. No.


 Q. You agree with basically the about 69 overall in there?


 A. Yes.
10. Dr. Garnett concluded:


 In sum, [the applicant] exhibits a level of thinking that is extremely concrete. He
lacks the ability to extrapolate or think abstractly. Individuals who exhibit impairments in
understanding, reasoning, and thought process like [the applicant] are unable to adequately
manage the demands of day-to-day functioning.
11. At the conclusion of his cross-examination, Edgerton agreed that the applicant's evidence "could
be interpreted" to support a diagnosis of mental retardation. Later, on re-cross-examination, he specifically
acknowledged that there was evidence in the record to show adaptive deficits in the applicant's conceptual,
social, and practical skills. Ultimately, he testified:


 Q. [The Prosecutor] asked you a question at the beginning of his redirect whether
you had changed your mind about certain things. I would like to ask you a question. Have
you changed your mind about your statement to me at the end of my cross-examination
that there is evidence in the record now supported by independent corroborating evidence
in the punishment phase of this trial, that would support a diagnosis that [the applicant] has
mild mental retardation?


 A. My opinion is still that he had -


 Q. I understand what your opinion is. My question is, do you agree with me that
there is evidence in the record supported by corroborating evidence at the punishment
phase of his trial in 1992, that supports the diagnosis that he has mild mental retardation?


 A. Yes.


Nevertheless, Edgerton expressed the view that the evidence was more consistent with a diagnosis of
conduct disorder than mental retardation, even though he also acknowledged that the two diagnoses were
not mutually exclusive. See text, post.
12. The Vineland Adaptive Behavior Test is one of the recognized standardized scales for measuring
adaptive deficits. See Ex parte Blue, supra, at 165 n.55.
13. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-Text Revision (4th Ed. 2000), at 47 ("The diagnostic criteria for Mental Retardation do not include an
exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met,
regardless of and in addition to the presence of another disorder.").
14. 135 S.W.3d at 8-9.
15. The applicant was convicted for the robbery/murder of a pizza-delivery man. The evidence
showed that the applicant's co-defendant summoned the delivery man and then directed the applicant in
disposing of the body, the automobile, and other evidence of the crime. With respect to the applicant's
participation in the actual killing, the convicting court observed:


 There are two basic versions of the facts of the killing: [the applicant's] version, i.e., that
[his co-defendant] handed him a knife and said, "get the pizza man" and [the applicant] just
went crazy and stabbed him; or, [the co-defendant's] version, i.e., [the co-defendant] went
outside to pay the pizza man and out of nowhere [the applicant] appeared and began
stomping and stabbing the pizza man. Under either scenario, [the applicant's] conduct
would appear to be impulsive and not well-planned.
16. The applicant committed an earlier robbery that seemed no more well-planned than his capital
offense would later prove to be. The applicant persuaded the victim to give him a ride in her car. Once
in the car, he grabbed the victim's granddaughter by the nec, and threatened to kill her unless the victim
gave him her money. Instead, the victim pulled into a fast-food parking lot and began to honk the horn. 
The applicant fled across the street to a park and hid in some bushes. Later he yelled threats at the victim
and then ducked back behind the same bushes. He was soon caught. As the convicting court observed,
"A well-planned robbery this was not. Why [the applicant] would remain in the area and draw more
attention to himself does not make any sense."
17. In its findings and conclusions, the convicting court quoted testimony from many of the witnesses
at the punishment phase of his trial, at the evidentiary hearing, and in the affidavits, who all attested to the
fact that the applicant was a follower and was easily led.
18. The convicting court accurately observed: "The evidence is quite clear that [the applicant] is
capable of hiding facts or lying. However, it is equally clear that he cannot do so very effectively and
certainly not in his own or other's interest? [sic] The record is replete with examples."
19. Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I shall not today attempt
further to define the kinds of material I understand to be embraced with that shorthand description ["hard-core pornography"]; and perhaps I could never succeed in intelligibly doing so. But I know it what I see
it, and the motion picture involved in this case is not that.").
20. 135 S.W.3d at 8.
21. The convicting court concluded its discussion of the significance of the media interview with the
following remarks:


 Granted, before being educated through this writ process, [the applicant's]
appearance on the televised interview is not one which this court would have thought was
indicative of mental retardation. As noted in Briseno, Steinbeck's Lenny is more what this
court would think a mentally retarded individual would look and act like. Unfortunately,
in this case, it is not that easy and the court must look at all the factors and not just one.
22. See ABA Guidelines for the Appointment and Performance of Defense Counsel in
Death Penalty Cases Guideline 4.1 (2003) ("The Defense Team and Supporting Services)
Commentary, at 31 ("Counsel's own observations of the client's mental status, while necessary, can hardly
be expected to be sufficient to detect the array of conditions [including mental retardation] that could be
of critical importance. Accordingly, Subsection A(2) [of Guideline 4.1] mandates that at least one member
of the defense team . . . be a person qualified by experience and training to screen for mental and
psychological disorders or defects and recommend such further investigation of the subject as may be
deemed appropriate."); State Bar of Texas Guidelines and Standards for Texas Capital
Counsel Guidelines 10.1(B)(2)(c) ("The Defense Team") & 12.2(B)(5)(b) ("Duties of Post-Trial
Counsel") (2006) ("Habeas corpus counsel should not rely on his or her own observations of the capital
client's mental status as sufficient to detect the array of conditions [including mental retardation] that could
be of critical importance. For that reason, at least one member of the defense team should be qualified to
screen for mental and psychological disorders or defects and recommend further investigation of the client
if necessary.").
23. See Robert B. Edgerton, The Cloak of Competence (rev. ed. 1993). Professors Patton and
Keyes have described this concept as follows:


 The term has often been cited to convey the reality that many individuals with mental
retardation, when given the chance, want to "pass" as normal and shed the label of mental
retardation. To accomplish this goal, these individuals will often try to hide their
deficiencies and come across as much more competent than they actually are. The
implications of this "cloaking" behavior can be dramatic when these individuals are
interviewed or asked to complete a standardized instrument of adaptive behavior (i.e., self-report format). Thorough examination of a person's life and levels of functioning typically
reveal accurate levels of functioning; however, the words and actions of an individual who
is trying to look as good as he or she can sometimes can become a complicating factor in
explaining adaptive functioning deficits.


James R. Patton & Denis W. Keyes, Death Penalty Issues Following Atkins, 14(4) Exceptionality
237, 252 (2006). "The limited ability of most lawyers to recognize mental retardation in their clients has
been well documented." James W. Ellis & Ruth A. Luckasson, Mentally Retarded Criminal Defendants,
53 Geo. Wash. L.Rev. 414, 493 (1985).
24. Ex parte Briseno, supra, at 9.
25. As noted earlier, we need not, and therefore do not, endorse the convicting court's conclusion that
the applicant has proven his mild mental retardation to a level of confidence beyond a reasonable doubt. 
Implicit in that finding, however, is a finding that the applicant has shown mental retardation at least by a
preponderance of the evidence. See note 7, ante.